Petitioner and Appellant in this manner. I would like to reserve five minutes for rebuttal. Okay, and the clock counts down, so when it gets to five, that means you've got five minutes left. Okay. This is a case about the proper role of a court when government agents engage in deliberate, systematic, and deceitful tactics to divert a transaction from its lawful path into illegality. And for that, there are three issues before the court, which is first, whether the district court judge erred by denying a constructive trust to the Ivory Coast where it was clearly established that federal agents acted by fraud and deceit to transform a transaction from a legal international transaction into an illegal transaction. Counsel, what was the fraud and deceit from your point of view? There are several fraud and deceit in this case. Number one is the fact that the federal agents were the first one to suggest to complete this transaction illegally. You have a case where Ivory Coast sent a request to the U.N. requesting a waiver from the embargo, and they were on a path to do everything legally. Everyone was involved, the U.N. and every other entity. What was the illegality specifically that the federal agents suggested? The federal agents suggested that there was no need to comply with the legal path, which would take time, so it was best to just do the transaction illegally. And that's clearly improper for them, when somebody comes to you to complete a transaction legally, for you to say, well, why would you do this legally? There is no reason to do it legally when you can take a shortcut. Go ahead. No, finish your response. Beyond that, the problem is at the time they were making those suggestions, the Ivory Coast was not aware of all those illegal acts. So the Ivory Coast hired Mr. Shaw as an agent to complete the transaction. He got convinced by the federal agent not to do it legally. At the same time, he's telling people in the Ivory Coast that everything will be completed legally, until the Ivory Coast wires $1.9 million in April 2010 to the U.S. And at that time, Shaw is arrested, becomes a cooperating defendant, and then decides to get other folks involved. But what do these agents also do? They knew that Mr. Nbichi, who was at the U.N., who was seeking compliance, wanted everything to be done properly. So instead of getting Mr. Nbichi involved in this illegal process, they used Minister Amani, who is in the Ivory Coast, to inform him that the transaction is illegal. But isn't it true that there wasn't time to go through all of the legal processes because the Ivory Coast wanted the weapons in time for the election? That's true. There was a timing to get those things. The problem is that if they could not get it here legally, they had ways to get arms. Judge, if you want to buy arms illegally anywhere on the globe, you don't come to the U.S. You don't come to the headquarter of the U.N. You go to Russia, you go to China, you go to Eastern Europe to buy arms illegally. Why did the Ivory Coast come to the U.S.? Because there was a deliberate decision to comply with the law. And because the U.N. embargo had specific provision in which it said that the Ivory Coast was actually not the police force were not properly equipped. So they would need those police force to be equipped. And they said, well, once you make a decision to equip your police forces, let us know, and we will get somebody to provide those things. But wasn't the minister of defense from the Ivory Coast involved in the purchase of the arms? He was involved, in fact. And that's another issue in this case. That's why the minister of defense was involved. But this is what he did. Rather than hiring somebody who was competent about buying arms, he went and got his friends to listen. He said, the Ivory Coast wants to buy arms, and what I want to do is to have you be the exclusive agent to do this. And you get me kicked back. I get 50 percent of the commission. And that's another reason why we say, well, those acts do not engage the Ivory Coast. Because the question here, and whether this court judge was mistaken, is that he asked, well, were these acts for the benefit of the Ivory Coast? Were they public acts for the benefit of the Ivory Coast? That's not the question. There is nothing illegal about buying arms. What is illegal here is the fact of buying arms using Mr. Shaw, who was not qualified, was not licensed to buy arms. But didn't Mr. ‑‑ I'm not sure I'm pronouncing the name correctly. Well, he wired the funds in payment of invoices that falsely described the products that were being paid for. He paid for, you know, solar panel invoices when he knew he was buying guns. Yes. That's correct, Your Honor. The description was on the bank note. And that's another issue. We're saying, did you, when you wired the money, it was told by Mr. Shaw. And these are part of the ‑‑ if you actually look at some of the wiretaps, which are still under sale, but if you look at the affidavit of the agent, which are exhibit, I think it's 144, you have Mr. Shaw telling the agent that he has connection within the State Department to make this deal done legally. So in which he was told that Mr. Shaw used his connection to get it done, but they couldn't disclose everything. So he's told, well, when you go to the bank, just put this for solar panel. The bank doesn't need to know why you're sending him this money. But he also said that the labels were falsified in order to conceal the transaction from the media in the Ivory Coast. Yes. And that's another issue. Because you have compliance. Mr. Shaw, he even told the agent that he has connection within the State Department to get this done. So when he's told, well, you know, we will make sure the media in the Ivory Coast doesn't know. It is not the intent to do the transaction illegally. It is the intent to keep it as a government act where the media doesn't know that the police force has been equipped. It has nothing to do with illegality. If I can go at the question this way, obviously you need a constructive trust here to make the argument because the property, the title is no longer in the Ivory Coast. And the way that you kind of get constructive trust is to show that the Ivory Coast has been defrauded. That's correct. But the Ivory Coast has not been defrauded if it was either a part of the transaction or if it knew what was going on so that it was not deceived. And you've got your minister of defense who seems to be involved in the transaction, and he knew what was going on. And you've got your U.N. attache. Again, I'm going to have trouble with the name, and Beachy, who also appears to be knowing what's going on. So it seems to me that the Ivory Coast knew that this was an illegal transaction, or at least people who are sufficiently associated with the government knew that this was illegal, and therefore that knowledge is charged to the Ivory Coast. Therefore, Ivory Coast was not defrauded. How do you respond to that? Okay, three ways. Number one, Minister Armani's act cannot bind the Ivory Coast because when the Ivory Coast decided to buy arms, if Minister Armani didn't have a kickback deal with Mr. Shaw, all they had to do was to go to another supplier who would get the required document. The only reason Minister Armani proceeded was because he was engaged in the illegal kickback deal. And it is clear which is actually a criminal act in Ivory Coast. And that's what the district court judge ignored. It was a criminal act for Minister Armani to agree to a kickback deal. So that act was first illegal, and under U.S. laws, actually, it was also assuming. Assuming I go along with that, which I'm not sure I do, but assuming that I do, how do you get past the argument that Mr. Nmbichi, the U.N. attache of the Ivory Coast, appears to have known that this was an illegal deal, and the district judge so found? How do you get around that? Okay. The district judge actually made finding of fact, which was improper under a motion for summary disposition. But beyond that, Mr. Nmbichi, and that's why we need discovery. After he wired the money and walked out of the bank, the agent came to him and said, well, listen, you need to sign a document stating that you know this is illegal. And why did they do that? Because they knew Mr. Nmbichi wanted compliance, but they didn't want him to know what was going on. So they only disclosed this illegality to the guys who were involved in the kickback. The guys in the kickback had no reason to withdraw from the deal, because they were not looking out for the Ivory Coast. They were looking out for their own kickback. And the only way you get the kickback is to deal with Mr. Shaw. If you get somebody else, you don't get your kickback. So those guys were involved. Nmbichi wired the money, and that's why we need — Nmbichi wired the money, walks out of the bank, and that's when this agent comes to him and says, well, you need to disclose that. But Mr. Nmbichi knew that the U.S. government had not given an exemption for the arms embargo. He knew that hadn't come through. So why isn't a conclusion that follows is that he knew the transaction was illegal? Because Amani actually told him — may I continue? Please, please. Amani actually told him that Mr. Shaw had people within the U.S. State Department who make this happen in a different way. But he knew it hadn't happened. The point is it hadn't happened, no matter which way it was contemplated or planned. It was until it happened, the transaction was illegal. And he was the ambassador to the U.N., so he knew that it hadn't happened. He didn't know, because what happened is Amani sent them there and said, listen, Mr. Shaw completed everything that needs to be done. Wire the money. And then — and that's — this gave credence to Mr. Nmbichi's theory, because Mr. Shaw in the wiretap told the U.S. agent, I have connections within the State Department. I'll make this happen. But he doesn't disclose that to Nmbichi. So when Nmbichi is told, well, this guy has his connections. He got it done. Don't ask questions. Send the money. Everything is good. He had his doubt, and that's why actually Nmbichi was smart enough to say, you know what? I'm going to wire this money from the U.N. bank account. That's why there couldn't be money to the U.N. bank account before it got wired, because he wanted to make sure that he was not misled in this process. And that's the problem here, because you have an agent in the Ivory Coast who is money working against the Ivory Coast. So on that basis alone, the transaction is void, because you have — this transaction is the fruit of the Poisonous Tree. And when you look at the district court judge who said, well, this activity was for the benefit of the Ivory Coast, that's not the proper question to ask. The question you ask is, would the Ivory Coast engage in this illegal act of buying arms using the services of Mr. Shaw if he were not for the fact that ministerial money had a $280,000 kickback in this transaction? Okay. You're down to about two minutes unchanged. Do you want to save that time? Yes. Okay. May it please the Court. Good morning, Your Honors. Owen Mardekin for the United States. The Ivory Coast, through its officials and agents, paid an arms broker money to achieve a public purpose, which was the equipping of its police through illegal means. The district court was correct to find that the Ivory Coast was responsible for the agent's actions. This is not — and I'd like to start sort of at the top with counsel's introduction. This is actually not a case about sovereign immunity or about special treatment of a sovereign for several reasons. In this case, I think it's extremely questionable whether a plaintiff can ever use sovereign immunity as a sword, but clearly it has been waived. And second, as I think the parties concede, it's a purely commercial transaction, so it would not fall within the Foreign Sovereign Immunities Act, which means that really regular principles of agency respondeat superior are applied. Well, why is this a purely commercial act? I understand that there's an exception to the Foreign Sovereign Immunities Act for commercial activities, so that, for example, Air France, operating as a commercial carrier, does not have the sovereign immunity of France. But this was obviously a governmental function. They're trying to buy arms in order to have those available during the election because they fear some sort of violence. That strikes me as sovereign activity. I understand the sovereign has to buy things, but if simply buying things by the sovereign is commercial activity within the meaning of the Sovereign Immunity Act, that's a pretty big loophole or a pretty big exception to the Act. Well, I believe it is commercial activity for a public purpose. But it's quite different from commercial activity, for example, the sovereign running a business, as Air France, for example. Not for purposes of immunity. I'd have to disagree with that, Your Honor, because in Weltover, the Supreme Court says, well, sovereigns buy bullets, they buy army boots, it's still commercial activity, even though it's clearly for a public purpose. Here we have a sovereign that is acting as a trader in the marketplace. It's not buying blankets, it's buying guns, but the blankets could be for a public purpose. I mean, certainly. Well, you've got various other arguments beyond commercial activity on sovereign immunity. True. But really, I think there are basic principles of agency, respondeat superior, that apply here. It's not unlike this Court's decision in Lu versus Republic of Taiwan, where you have an intelligence official who comes to the Bay Area and assassinates someone. And the Republic of Taiwan's defense is, well, we never authorized that. And this Court said that he was within the scope of his office when he did that, because he acted at least in part to benefit the Republic of Taiwan. Sotomayor, what's your response to opposing counsel's representation that the U.S. government Federal agents were the first to suggest purchasing the weapons illegally? What's your response to that? Well, what the record shows, and this is at page 184 of the excerpt of the record, is that the agent did ask Shor what he wanted to do, assuming there was trouble with the transaction. Page 184, he says, well, to be specific, the undercover agent says, well, the State Department can say no to something, but that's not to say there aren't other ways of delivering the goods. So my question is, what are your contingencies if this doesn't work? The answer is we go the other way. Then later ---- But what's the implication of that in your view? That the agent is ---- That it's change. I don't think there's any legal implication of it, because even if this could be seen as potential entrapment, that's not a defense to forfeiture. So these parties didn't raise entrapment in the district court. In other words, it was not an issue. Does it go toward deception at all in the constructive trust theory? No, because Shor actually says, and this is just a few lines beneath that, he says, well, that's good to know, talking about this potential plan B, and I was hoping you would say that. At some point I wanted to cross that bridge. So Shor was perfectly ready to go the illegal route. The significance of getting these weapons was getting them in time for the election. So whether that was through the U.N. exemption, great. If that didn't work out, they still wanted those weapons for the election. So they were clearly prepared to get them by any means necessary. And Shor says, although I don't think there's any doubt about it, on page 183, that he was acting as the exclusive agent for not just the defense minister, but the Ivory Coast government. Armani was bribed, and how can an agent who accepts a bribe to effect a transaction be said to be operating within the scope of authority? Well, I think the issue is if there is some private gain involved, does that negate the entire public purpose of the transaction? And I would say no under Lu, because in Lu, this court said, Lu v. Republic of Taiwan, this court said that as long as there was some intent to benefit the sovereign, we don't care that there was also some personal benefit. So in that case, there was a personal grudge that the agent had against the victim. In this case, the kickback was never paid. Certainly there was a negotiated kickback, but there was a much greater sovereign purpose, which is to get the guns to the country before the election. And I think this could have been a different case and maybe more like the Marcos case if he had been buying guns for his own collection, for example, or just so his friends could go out hunting with them. Then maybe this would have been something for purely private gain. But here we have, I think conceitedly, a public purpose. So he is acting to benefit the sovereign. The sovereign is answerable to his conduct. And frankly, I don't think there is much higher you could get in the chain of government there than the defense minister except for the president. And I think this is clearly within the agency of the defense minister to negotiate arms transactions. So in your view, it does not defeat the status of Defense Minister Amani as an agent for the government that he was in fact, as he went through this transaction, violating the law of Cote d'Ivoire by being a corrupt official? Correct. And I don't think that's what the district court said. I don't think the district court needed to go that far. Because I think the district court was talking about cases where the defendant, the sovereign, is trying to defeat sovereign immunity. This is a different case. Yeah, the sovereign is trying to show that it was defrauded. Right. And so this is more like the Iraq case in the Southern District of New York or the Liu case where the court says, you know, it doesn't matter if this is an illegal act. The sovereign can be responsible for illegal acts of its agents, which is exactly what the Southern District of New York said in the Iraq case, which was since affirmed. So I think that's a bit of a red herring for the defense to focus on the bribe. Assume for a moment that we cannot attribute to the Ivory Coast for purposes of this constructive trust argument the actions of Defense Minister Amani, so we need to look to the ambassador to the U.N., the attache, Mr. Ambishi. I asked why is it wrong to conclude, as the district judge did, that the U.N. attache knew about this, knew that the deal was illegal, and therefore Cote d'Ivoire knew this was illegal, and therefore because it knew it couldn't have been defrauded within the meaning of the constructive trust. What's the evidence that Mr. Ambishi knew that this was an illegal transaction? Well, as counsel said during his argument, Nabitchi signed a document agreeing that he understood the transaction was illegal. He said that in his argument, and it's alluded to in his declaration. What document are you talking about? The document, the actual document is not in the record, but he does say, he does allude to it, and it was argued. What is the it you're referring to? That he signed a document, counsel said, that saying that he understood the deal was illegal, but he said, just now in argument, that he did so under pressure. What is the document you're talking about? Well, it's not in the record, so I just bring that up because counsel asked. So what's in the record that allows us to have some knowledge about this document, or whether he signed it or whatever? I mean, what's in the record that helps you on this point? Well, there is an allusion to it in paragraph 22 of Nabitchi's affidavit, where he said — Where is that, the excerpts of record? What page are you on? 47, Your Honor. Okay. He says, they, agents, forgot to ask us to sign a document regarding the shipment. We quickly signed the document in front of the bank because we had sent our funds and were obliged to do anything the other side wanted at that time. Then there is a declaration from government counsel at docket number 156 where she talks about this document and says she would be willing to provide it in camera. So I didn't mention it because it was a — But it doesn't describe what was in the document at all. No, just the declaration. But it — I just mention that because counsel did. I don't think we need to rely on that at all. I think what the court can rely on are the false bank drafts that he admits to at page 47. The fact that he admits in his declaration that he was a lawyer and his entire charge was to see that this came through illegally. So where on page 47 are you referring to? I'm sorry. Page 47. Yeah. The earlier reference was to paragraph 22 about this document. Paragraph 23 is the false bank draft admission in paragraph 24. But paragraph 23 just says, well, we're trying to get around the bank. It doesn't say we're trying to get around the government. Correct. But Schor says, and Yao says, and Yao, this is in his plea agreement, says that the real purpose of that was to get around the embargo. And Schor says that as well. So how do we attribute that knowledge that Schor has to Nabishi? Well, Yao says in his plea agreement that the person who wired the funds, Nabishi, was his co-conspirator. And so he says that he and his co-conspirators knew that this was an illegal deal, and that's at pages, supplement of record, pages 18 and 19. Now, the Ivory Coast asked the Court to not look at that, saying that it wasn't in the record. But that's actually not true. It was incorporated by reference or referenced in the government's opposition to summary judgment motion at page 8. That's docket number 148, page 8. It was also quoted in full in the joint case management conference statement, excerpts of record 121, 122. And, of course, the plea agreement was filed on the open record. So it was in the record in the district court. But beyond that, the fact that Nabishi wired this money, even though he says he was charged with making sure he saw certification that this complied with the embargo and admits that he never saw that documentation showing that it complied with the embargo, at least puts the burden on him to explain why he did that. And third of all, he says that even though he says he had doubts about Shor, this is in paragraph 21, but felt that he was required to deal with him. But I'd like to back up for a moment, because I think that Nabishi's innocence or purported innocence is really, it's irrelevant. It's a bit of a sideshow because there are other agents that bind the government here, not just Amani but also Shor. Shor says that he was, he had an exclusive agency with the Ivory Coast government and that, of course, he knew what was going on. He understood that this, and Yao, military attache, who says he has 30 years of experience in the Ivory Coast military, also says that he had knowledge of what was going on. Did you say that in his plea agreement Yao named Shor as a co-conspirator? I'm sorry. He, Nabishi, no. Your Honor. What did you say about Yao and who he named as a co-conspirator in his plea agreement? Okay. I thought you said something about that. Okay. Yes, I did, Your Honor. Page 18 of the supplemental excerpts of record, Yao says, My co-conspirator authorized a transfer of $1.96 million from the government of the Cote d'Ivoire as final payment of the outstanding balance. And, of course, Nabishi says he was the one who wired that money. Okay. So that's what I was referring to. All right. So briefly, Your Honors, Nabishi's purported innocence is necessary but not sufficient to the Ivory Coast summary judgment motion. And they can't prove it, because at the very least, there's a genuine issue of material fact about Nabishi's innocence that would defeat their motion. But it is completely irrelevant to the government's summary judgment motion, because there are other agents whose misdeeds are imputed to the Ivory Coast. And I don't think it was an abuse of discretion for the government, I mean, for the district court not to order additional discovery. And I'd ask the Court to affirm. Thank you.  Thank you very much. You've saved some time. You sought to reserve five minutes. We took you over. Why don't we put five minutes on the clock? Thank you, Your Honor. If I may briefly address a few things. Number one, this Court is entitled to the same set of facts that the U.S. government presents to a grand jury when they seek to indict. So they can change the fact when it is more convenient for them to give all the facts to a grand jury and show that the Ivory Coast was a victim of a fraudulent kickback scheme and come before this Court and give you a different set of facts. That's simply improper. What were the — to the extent you can discuss them, what were the differences? Many. Number one, initially, the affidavit before the grand jury presented to a grand jury said that the Ivory Coast was a victim of a kickback — fraudulent kickback scheme by its Minister of Defense. And then, in that document, it shows that the price was inflated so that they could complete the transaction with a kickback. Number three, Mr. Shaw was hired as an exclusive agent, knowing full well that he has no knowledge in the armed business. So the question is, was it here a private act or a public act? If Mr. Shaw wasn't a Minister of Money, an exclusive agent, who would give him $280,000, would they agree to proceed with this transaction? That's the question you ask. You don't ask, was the purchase of arms illegal in the interest of the Ivory Coast. You ask, was it in the interest of the Ivory Coast to hire a man who has no license to export arms, who has no knowledge in that business, to buy arms from the Ivory Coast? That's where the illegality is. But they did. Yes, they did. And the only reason they did — The Ivory Coast hired the guy.  That's the point. The Ivory Coast, you know, Mr. Minister of Money hired him. And that's a criminal act. And he hired him because he could get the kickback, which is — let me note something here. Assuming that this transaction was completed legally, Mr. Shaw could have been indicted, and the Ivory Coast could actually disown the entire transaction based on that kickback, even if the U.N. had approved the transaction and the U.S. had given the transaction what it wanted. Because under the U.S. Foreign Corrupt Practices Act, a U.S. citizen who goes overseas and bribe people and engage in this kind of stuff can be charged criminally. And since that act is illegal, the Ivory Coast will be entitled to reject the entire transaction. Number two, it is clear by the fact that counsel could not give this court the fact necessary with regard to Mr. Nbiji, show that the grant of summary judgment was improper. Because instead of deciding whether there is a dispute issue of fact, he, the district court judge, made factual finding. And then, in making this factual finding, when it is convenient for him, he said, well, Minister of Money wired the money. His whole decision was based on, well, Minister of Money wired the money, when it wasn't Minister of Money who wired the money. So that factual error alone is sufficient to reverse a district court judge. Number three, counsel referred to a dissension between an act for private gain and public purpose. Once again, the public purpose is not the purchase of arms, but the purchasing of arms is not illegal. It is purchasing of arms without the proper documentation and without the proper license is illegal. And in this case, it is only illegal because Minister of Money hired his friend to get kicked back. So for all those reasons, it is clear that the district court judge, the advocacy is entitled to a constructive trust, because this is unjust enrichment all the way. If you don't impose a constructive trust, the U.S. gets almost $4 million for suggestions that the act be done illegally. And, Judge, when you ask, well, who came up with the idea? Three questions here. Who came up with the idea of completing the transaction illegally? The U.S. agent. Who came up with the idea that, well, there are other ways of doing it and the plan? The U.S. agent. Who came up with the scheme on how to do it? The U.S. agent. Yeah, but that's an entrapment argument that does not seem to me quite relevant to the constructive trust argument. Yeah, and, Judge, here it is, because under the California statute, it says interest in property or any other, the person who owns the property under any other wrongdoing. But you would have to show some type of deception in reliance for a constructive trust. That's correct, Your Honor. And the deception here is for U.S. agents to come in and say, well, why would you do this transaction illegally? It is too much work. Don't do it legally. Just do it illegally. And then they create a scheme to do it. And then what then would become the whole plan? And, Judge Fletcher, your — Well, what was the deception, though? If the officials from the Ivory Coast were not deceived about it but just went along with it, where is the deception? The deception is for the U.S. agent to initially, if you look at the exit of record, I think it's 144, the agent said, hey, listen, we are licensed to do this armed transaction internationally. We're licensed with ITR, and we also know how to get this done. And then they come back and say, well, if the State Department doesn't want to do it, you can do it other ways. And the officials from the Ivory Coast could have said, no, we don't want to go around the law. We want to do it legally. That's the point. Before the Ivory Coast — the Ivory Coast didn't know about this until they wired the first amount in April of 2010. They wired 1.9 million without knowing about it. And then Shaw comes back after the first money is wired and says, well, we can do it illegally. And then you have Mr. — the minister at that point who goes along. Instead of sending the document, if they wanted to do this to see the Ivory Coast would go along, they should have sent the document to Nvechi and said, listen, this is illegal. Would you do it? No. Let's send it to the guy who has every personal reason to complete the transaction, Minister Armani, because he has every reason to defraud the Ivory Coast and take its money. On that basis, thank you. Okay. Thank you very much. Thank you. Thank you both. Thank both sides for your arguments. The case of the United States v. America v. Ivory Coast is now submitted for decision. The second case on the argument calendar this morning, Marguerite Heiken or Heekin and the Military Laws Task Force v. Department of Defense.
judges: Parker, W. Fletcher, Rawlinson